Filed 12/9/20; Additional Sections Certified for Partial Publication 1/7/21 (order attached)

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTELOPE VALLEY GROUNDWATER CASES† | |
| PHELAN PIÑON HILLS COMMUNITY SERVICES DISTRICT, | F082094 |
| Cross-complainant and Appellant, | (JCCP No. 4408) |
| v. | **OPINION** |
| CALIFORNIA WATER SERVICE COMPANY et al., | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Jack Komar,‡ Judge.

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., III., and IV. of the Discussion.

†*Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Los Angeles County, No. BC325201); *Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Kern County, No. S-1500-CV254348); *Wm. Bolthouse Farms*, *Inc. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC353840); *Diamond Farming Co. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC344436); *Diamond Farming Co. v. Palmdale Water Dist.* (Super. Ct. Riverside County, No. RIC344668); *Willis v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC364553); *Wood v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC391869).

‡Retired judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Aleshire & Wynder, June S. Ailin and Nicolas D. Papajohn for Cross-complainant and Appellant.

Lagerlof, Senecal, Gosney & Kruse and Thomas S. Bunn III for Cross-defendant and Respondent Palmdale Water District.

Murphy & Evertz and Douglas J. Evertz for Cross-defendants and Respondents City of Lancaster and Rosamond Community Services District.

Olivarez Madruga Lemieux O'Neill and W. Keith Lemieux for Cross-defendants and Respondents Littlerock Creek Irrigation District, Palm Ranch Irrigation District, Desert Lake Community Services District, North Edwards Water District, Llano Del Rio Water Company, Llano Mutual Water Company, Big Rock Mutual Water Company and Quartz Hill Water District.

Mary Wickham, County Counsel, Warren R. Wellen, Deputy County Counsel; Best Best & Krieger, Eric L. Garner, Jeffrey V. Dunn, and Wendy Y. Wang for Cross-defendant and Respondent Los Angeles County Waterworks District No. 40.

Kuhs & Parker and Robert G. Kuhs for Cross-defendants and Respondents Tejon Ranchcorp, Tejon Ranch Company and Granite Construction Company.

Law Offices of LeBeau Thelen, and Bob H. Joyce for Cross-defendants and Respondents Diamond Farming Company, Crystal Organic Farms, Grimmway Enterprises, Inc., and Lapis Land Company, LLC.

Michael N. Feuer, City Attorney; Kronick, Moskovitz, Tiedemann & Girard and Eric N. Robinson for Cross-defendants and Respondents City of Los Angeles and Los Angeles World Airports.

Venable and William M. Sloan for Cross-defendant and Respondent U.S. Borax, Inc.

Richards, Watson & Gershon and James L. Markman for Cross-defendant and Respondent Antelope Valley–East Kern Water District.

Ellison, Schneider, Harris & Donlan and Christopher M. Sanders for Cross-defendants and Respondents Los Angeles County Sanitation Districts Nos. 14 and 20.

Zimmer & Melson and Richard Zimmer for Cross-defendants and Respondents Wm. Bolthouse Farms and Bolthouse Properties, LLC.

-ooOoo-

Over 20 years ago, the first lawsuits were filed that ultimately evolved into this proceeding known as the Antelope Valley Groundwater Cases (AVGC). The AVGC proceeding litigated whether the water supply from natural and imported sources, which replenishes an alluvial basin from which numerous parties pumped water, was inadequate to meet the competing annual demands of those water producers, thereby creating an "overdraft" condition. Numerous parties asserted that, without a comprehensive adjudication of all competing parties' rights to produce water from and a physical solution for the aquifer, this continuing overdraft would negatively impact the health of the aquifer. Phelan Piñon Hills Community Services District (Phelan) ultimately became involved in the litigation as one of the thousands of entities and people who asserted they were entitled to draw water from the aquifer.

After the Judicial Council ordered all then-pending lawsuits consolidated into this single adjudication proceeding, the trial court embarked on an 11-year process in which it, seriatim, defined the geographical boundaries for the Antelope Valley Adjudication Area (AVAA) to determine which parties would be necessary parties to any global adjudication of water rights, and then determined that the aquifer encompassed within the AVAA boundaries (the AVAA basin) had sufficient hydrologic interconnectivity and conductivity to be defined as a single aquifer for purposes of adjudicating the competing groundwater rights claims. Its next phase found the AVAA basin was in a state of chronic overdraft because extractions exceeded the basin-wide annual "safe yield" of 110,000 acre-feet per year (afy) by a considerable margin. The next phase quantified how much water was currently being pumped by each of the major competing water

3.

rights claimants; these annual extractions (even without considering the amounts extracted by a large class of overlying right holders known as the "Small Pumper Class") were in excess of the safe yield for the AVAA basin. The next phase, which contemplated trial of the issues of federal reserved water rights and imported water return flow rights, was interrupted by settlement discussions, which ultimately produced an agreement among the vast majority of parties in which they settled their respective groundwater rights claims and agreed to support the contours of a proposed plan (the Physical Solution) designed to bring the AVAA basin into hydrological balance.

Phelan was not among the settling parties. Accordingly, before considering whether to approve the proposed global water allocations and Physical Solution for the AVAA basin, the court first conducted separate trials at which Phelan's claims were litigated and resolved. Thereafter, the court held a trial on the rationale for and efficacy of the proposed Physical Solution. After finding the proposed Physical Solution was reasonable, fair and beneficial as to all parties, and served the public interest, the court approved the Physical Solution.

Phelan, which provides water to its customers who are located outside the AVAA boundaries, became subject to the AVGC litigation because a significant source of its water is pumping from a well (Well 14) located in the AVAA basin. The court's judgment and adopted Physical Solution concluded that, while Phelan held no water rights in the AVAA basin (either as an appropriator of a surplus or by prescription), Phelan could continue operating Well 14 to draw up to 1,200 afy to distribute to its customers outside the AVAA, on condition that Phelan's pumping causes no material harm to the AVAA basin and that Phelan pays a "Replacement Water Assessment" for any water it pumped for use outside the AVAA.

Phelan challenges the judgment, raising four claims of error. First, Phelan asserts there is no substantial evidence to support the trial court's conclusion the Physical Solution will bring the AVAA basin into hydrological balance. Second, it argues the trial

4.

court erred when it rejected Phelan's claim that, even assuming the AVAA basin was in overdraft, Phelan was entitled to water rights in the AVAA basin as an "appropriator for municipal public use" under Water Code sections 106 and 106.5. Third, Phelan asserts that, assuming the existence of a "surplus" in the AVAA basin *was* a condition precedent to Phelan's acquisition of water rights as an appropriator, the phasing of the various trials denied Phelan its due process rights to establish the AVAA basin *did* have a surplus at the time Phelan began operating Well 14. Finally, Phelan contends the trial court erred when it rejected its claim that it was entitled to credit for "return flows" and erred by imposing a Replacement Assessment Fee based on the gross amount of water extracted by Well 14.

We conclude substantial evidence supports the judgment as to Phelan, that the court correctly rejected Phelan's claim it had cognizable water rights as an appropriator for municipal purposes, that Phelan was not deprived of its due process rights to present its claims, and that the court did not err in rejecting Phelan's claim to return flows from native water it pumped from the AVAA basin. Accordingly, we will affirm the judgment as to Phelan.

## FACTUAL AND PROCEDURAL HISTORY

*Factual Setting*

There is a single aquifer, consisting of several hydrologically interconnected subbasins, underlying the AVAA. That aquifer was in a state of overdraft—meaning that long-term extractions from the aquifer have exceeded the amount of water replenishing that aquifer by "significant margins"—and had been in overdraft for decades before the current litigation commenced in 1999. While localized conditions led to variable impacts from this overdraft within specific subportions of the AVAA, the overall water levels within the AVAA basin were declining, and the declining water levels have caused significant long-term damage, including subsidence and lost aquifer storage capacity. The estimated average annual safe yield from all sources of recharge (natural sources such as precipitation, external sources such as imported water, and return flows) was

5.

110,000 afy for the AVAA basin, but the numerous parties who pumped water from that basin were annually extracting between 130,000 and 150,000 afy.

Phelan owns a parcel within the boundaries of the AVAA on which it operates Well 14. In late 2005, it started operating Well 14 and extracting water from the AVAA basin, and it first delivered water from Well 14 to its customers in 2006. Phelan is a public agency organized as a community services district supplying water to over 21,000 residents, nearly all of whom use it for domestic uses, and Phelan's source for the water it distributes is from groundwater pumped from its various wells. Phelan's entire service district is outside the AVAA, although a portion of its service district and some of its customers overlay a portion of the alluvial basin defined by the California Department of Water Resources' Bulletin 118 as the "Antelope Valley Groundwater Basin" (AVGB).

### The Litigation Commences

Between late 1999 and early 2000, the first lawsuits (which ultimately evolved into the AVGC) were filed by Diamond Farming Company and Wm. Bolthouse Farms, Inc., concerning competing water rights in the aquifer. These actions, styled as quiet title actions against various public water suppliers, sought a determination of the various rights and priorities of overlying landowners and others claiming rights to extract water from the AVAA basin. Over the next several years, additional complaints and cross-complaints were filed, which evolved into the AVGC and which sought a comprehensive determination of the water rights of thousands of persons, companies, public water suppliers, and the federal government, as well as a physical solution to alleviate the alleged overdraft conditions in the AVAA and to protect the AVAA basin.

### Phase 1: Determining the Geographic Boundaries of the AVAA

The trial court segmented the various issues raised by the actions and held trials on these issues in phased proceedings. In October 2006, the court conducted trial to establish the jurisdictional boundaries for the AVAA. Establishing the boundaries was essential in order to determine what parties and entities with claims to the groundwater

would be necessary parties in the litigation, as either overlying owners with usufructuary rights or as appropriators producing water from the aquifer, so that a comprehensive adjudication of all claims could be made in later proceedings. After hearing expert testimony, the court determined the boundaries of the alluvial basin as defined by the California Department of Water Resources' Bulletin 118 should be the "basic" jurisdictional boundaries for the AVAA, although it set the easternmost boundary for the AVAA at the jurisdictional line that had been previously established as the westernmost boundary in the "Mojave litigation." The court left open the possibility that areas presently encompassed within the AVAA might be excluded (if shown to lack any real connection to the AVAA aquifer), or other areas might be included, as might be warranted by further evidence.

***Phase 2: Determining Hydraulic Connectivity Within the AVAA Boundaries***

In the second phase, the court heard evidence to assess the hydrologic nature of the aquifer within the geographical boundaries set for the AVAA. The court specifically evaluated whether there were any distinct subbasins within the AVAA basin that lacked any hydrologic connection such that they should be treated as separate, unconnected basins for purposes of adjudication. The court concluded there was enough hydraulic connectivity within the AVAA basin as a whole to obviate any claim that certain sections should be treated as separate basins.

***Phelan Intervenes***

In late 2008, Phelan filed its cross-complaint alleging seven causes of action. Among its claims were (1) Phelan had an appropriative right to pump water from the AVAA because there was surplus water in that the basin's safe yield exceeds the volume pumped from the basin; (2) Phelan had "municipal priority" rights under California law "both as a result of the priority and extent of its appropriative and prescriptive rights, and as a matter of law and public policy" under statutory law; (3) Phelan had the right to the "recapture of return flows"; and (4) that some parties' use of water was unreasonable and

7.

constituted "waste, unreasonable use or an unreasonable method of diversion or use," and such parties' water rights should be determined and limited to reasonable uses rather than actual uses.

*Phase 3: Determining Safe Yield and Overdraft*

In the Phase 3 trial, the parties litigated the safe yield for the AVAA basin and whether the area encompassed within the AVAA was in overdraft.[1]  The Public Water Suppliers[2] (PWS), along with numerous other parties, contended the average annual extractions from the AVAA basin exceeded the relevant safe yields and that it was in overdraft.  It proffered extensive testimony on average annual recharge, annual extractions, and the deleterious impacts from the chronic overdraft of the AVAA basin.

Phelan did not contest the contentions of the PWS in Phase 3 that the AVAA basin was in overdraft.  Instead, Phelan sought to proffer evidence from its expert, Thomas Harder, concerning his study of the conditions in an area that encompassed both a southeast corner of the AVAA basin as well as land outside the boundaries of the AVAA.

---

[1]In the context of an alluvial basin, "safe yield" is defined as "'the maximum quantity of water which can be withdrawn annually from a ground water supply under a given set of conditions without causing an undesirable result.'  The phrase 'undesirable result' is understood to refer to a gradual lowering of the ground water levels resulting eventually in depletion of the supply." (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 278, disapproved on other grounds in *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1248.)  In essence, "safe yield" examines the available groundwater recharge from replenishing sources such as native precipitation and associated runoff, along with return flows from such sources, less losses incurred through natural groundwater depletions such as subsurface outflow or evaporative losses.  (*City of Los Angeles*, *supra*, at pp. 278–279; see *Tehachapi–Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 996, fn. 3 ["Natural 'safe yield' is the maximum quantity of ground water, not in excess of the long-term, average, natural replenishment (e.g., rainfall and runoff), which may be extracted annually without eventual depletion of the basin"].)  "Overdraft" examines whether the average annual withdrawals or diversions exceed the safe yield of a groundwater supply and would lead to ultimate depletion of the available supply.  (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1272.)

[2]Consisting of cross-defendants California Water Service Company, City of Lancaster, City of Palmdale, Littlerock Creek Irrigation District, Los Angeles County Waterworks District No. 40, Palmdale Water District, Rosamond Community Services District, Palm Ranch Irrigation District, and Quartz Hill Water District.

Phelan contended (consistent with the PWS position) Mr. Harder would confirm that the area he studied showed pumping by Phelan and others has resulted in declining water levels in the southeast portion of the AVAA, and that "overdraft exists in the Southeast area of the [AVAA], or will exist in the near future, if groundwater pumping in this area continues at current rates or increases."[3]

The court found the AVAA basin was in a state of overdraft, and that average extractions had significantly exceeded average recharge for decades, causing a steady lowering of water levels and accompanying subsidence since 1951. The court concluded the average total safe yield from all sources[4] was 110,000 afy for the AVAA as a whole, while current actual extractions from the AVAA as a whole (ranging between 130,000 and 150,000 afy) exceeded average annual recharge. Accordingly, the court found (1) the AVAA was in overdraft and (2) the annual safe yield was a total of 110,000 afy.

***Phase 4: Determining Actual Groundwater Production by Claimants***

In the next phase, the court ultimately determined it would limit trial to individualized determinations of how much water the various claimants actually pumped

---

[3]The court ultimately ruled that, while Harder could testify about impacts of pumping from Well 14 because it was sited within the AVAA jurisdictional boundaries, the bulk of Harder's proffered testimony would be excluded from the Phase 3 trial because Harder's testimony was principally focused on pumping and return flows in areas outside the boundaries of the AVAA.

[4]It appears the *total* annual safe yield ultimately set by the court as the appropriate "quantity of pumping from the basin [that] will maintain equilibrium in the aquifer" was an amalgamation of two different components: amounts attributable to "native" water and amounts attributable to "imported" water. Various experts testified that *native* water additions (i.e., water coming into the basin from precipitation and runoff) provided new water to the AVAA basin ranging between 55,000 to 68,000 afy. When "return flows" from that new water were calculated, the PWS contended the *native* safe yield should be set at approximately 82,300 afy for the AVAA basin as a whole. However, various entities also imported additional water into the AVAA, and when that *imported* water (along with *its* return flows) was added to the native supply, the total safe yield for the AVAA basin was determined by the court to be 110,000 afy.

9.

from the AVAA basin during the years 2011 and 2012.[5]  Based on the stipulations and evidence presented by numerous parties about the amounts pumped during the relevant time frames, including Phelan's evidence that it pumped 1,053.14 acre-feet in 2011 and 1,035.26 acre-feet in 2012 from the AVAA basin, the court determined how much water the various major stakeholders actually pumped from the AVAA basin in the relevant years.  The amounts actually pumped during those sample years exceeded the previously determined safe yield.[6]

### *Commencement of Phase 5:  Federal Reserve Rights and Imported Water Return Flow Rights*

The Phase 5 trial bifurcated two issues for the next trial phase:  (1) federal reserved water rights, and (2) any claimed rights to recapture and use any return flows from water imported into the AVAA.  However, during the evidentiary presentations on the federal reserved water rights, the parties requested a recess of pending proceedings to

---

[5]Initially, the case management order (CMO) for the Phase 4 trial contemplated it would encompass a vast array of issues, including the issue ultimately tried (current groundwater production for the two-year period which preceded the Phase 4 trial), but it also contemplated the trial would litigate each pumper's claimed reasonable and beneficial use of water the water pumped, as well as claimed return flows from imported water and federal reserved rights.  However, that CMO subsequently evolved to narrow the issue tried in Phase 4 and provided that "proof of claimed reasonable and beneficial use of the water for each parcel to be adjudicated" would only encompass "the amount of water used by each party and the identification of the beneficial use to which that amount was applied, but will not include any determination as to the reasonableness of that type of use [or] of the manner in which the party applied water to that use …."  The fifth amended CMO ultimately provided the "Phase [4] Trial is only for the purpose of determining groundwater pumping during 2011 and 2012.  The Phase [4] Trial shall not result in any determination of any water right, or the reasonableness of any party's water use or manner of applying water to the use.  The Phase [4] Trial will not preclude any party from introducing in a later trial phase evidence to support its claimed water rights ….  All parties reserve their rights to produce any evidence to support their claimed water rights and make any related legal arguments including, without limitation, arguments based on any applicable constitutional, statutory, or decisional authority."

[6]The court found that, during the sampled years, the parties cumulatively pumped in excess of 120,000 afy even before consideration of the amounts pumped by the "Wood Class," and apparently without consideration of the amount that would be subject to any federal reserved right.

permit further settlement discussions.  The parties then met and conducted settlement discussions, and in April 2014, the parties informed the court that the vast majority of the parties had reached a proposed global settlement of their respective groundwater claims.  The settlement included agreement on the contours of a basin-wide groundwater management plan to implement a Physical Solution to the AVAA basin's overdraft conditions that accommodated the groundwater rights of the parties to the global settlement.

Although Phelan participated in the settlement negotiations, the parties were unable to reach agreement settling Phelan's claims to water from the AVAA basin.

### Trial of Phelan's Preserved Claims

Because the parties were unable to reach a satisfactory agreement to accommodate Phelan's claims to pump water from the AVAA basin for use outside the AVAA, the court set a series of trials in which to litigate and resolve Phelan's claims for relief.

#### "Stage One":  Trial on Phelan's Preserved Claims for Appropriative and Return Flow Rights

The court held hearings and conferences to delineate which of the claims raised by Phelan's cross-complaint should be tried next.[7]  The court opined the appropriate scope

---

[7]In its case management statements, Phelan indicated it had abandoned its claim of a prescriptive water right, but had seven remaining causes of action.  Phelan identified three key issues that should be litigated in the next stage.  First, Phelan asserted it had obtained an appropriative water right to pump from Well 14 as an appropriator of surplus water; it asserted there was a "local area" surplus in the portion of the AVAA where its Well 14 was sited because groundwater levels in the Buttes and Pearland subbasins had not changed significantly since 1951, which it contended showed a lack of overdraft in those two subbasins.  Phelan alternatively asserted it was an appropriator for public use of nonsurplus water.  Phelan also asserted a form of return flow "rights," arguing that the evidence would show that some of the water drawn *from* the AVAA basin by Well 14 returned *to* the AVAA basin, and that consideration of this return flow should be factored into "the overall water balance with [Phelan] receiving an offset against potentially future assessments or liabilities, anti-export provisions, or otherwise arising from the anticipated physical solution to be fashioned by the Court."  (Italics omitted.)  Finally, Phelan argued that although the jurisdictional boundaries established for the AVAA excluded Phelan's service area, the hydrogeologic reality was that the aquifer extended eastward (crossing over the AVAA boundaries) to encompass part of Phelan's service area, and

of issues to be tried in the first stage should include (1) whether Phelan could show it had acquired an appropriative water right by showing there was a surplus in the AVAA basin,[8] and (2) whether Phelan could establish a return flow right from native waters that provided some support for Phelan's claims.

Trial on these aspects of Phelan's preserved claims occurred in late 2014. The parties agreed on a set of stipulated facts and exhibits. Phelan also introduced the testimony of two witnesses, including its expert hydrogeologist, Mr. Harder. The court then heard argument on and ultimately granted cross-defendants' motions for judgment. It issued a partial statement of decision on the stage one issues, which found Phelan had no appropriative right to pump from the AVAA basin because Phelan had not satisfied its burden of proof to show there was surplus water available for an appropriative use. The court specifically found the Butte subbasin (where Phelan's Well 14 is located) was adjacent to and hydrologically connected with other parts of the AVAA basin and served as a source of water recharge for the overall AVAA basin. It further found that localized

this fact should be accounted for in determining (1) whether Phelan's use of Well 14 water within its service area was subject to any anti-export prohibition and (2) whether Phelan could be credited for recaptured return flows. Thus, it appears Phelan sought trial on its second cause of action (appropriative rights to surplus water), its fourth cause of action (municipal priority to water use as against all nonmunicipal users), its sixth cause of action (declaratory relief regarding return flows from water extracted and distributed by Phelan in its service area), and elements embedded in its eighth cause of action (declaratory relief on the boundaries of the basin).

[8]The parties discussed the relevance of testimony concerning water levels in the Butte subbasin. Specifically, the parties sought to determine whether, in light of the court's decisions in Phase 2 (that there was sufficient hydraulic connectivity within the AVAA aquifer as a whole to obviate the claims that certain sections should be treated as separate basins) and Phase 3 (that the AVAA basin as a whole was in overdraft), Phelan's evidence concerning water levels in one portion of the AVAA (the Butte subbasin where Well 14 is located) was germane to Phelan's attempt to show a surplus existed in the AVAA as whole when it brought Well 14 online. The court observed that Phelan had not previously proffered evidence that the Butte subbasin was a totally separate basin lacking hydrologic connectivity to the overall AVAA basin, and therefore opined that demonstrating surplus for the AVAA as a whole (rather than in a particular section) would be required, but recognized Phelan "may have other evidence [or] may be able to demonstrate, as a matter of law, that it doesn't matter."

variations in groundwater levels within portions of the basin were insufficient to demonstrate there was surplus water in the overall AVAA basin upon which Phelan could acquire an appropriative right to water from the basin. The court also rejected Phelan's sixth cause of action, ruling Phelan had no cognizable right to pump return flows attributable to native waters that recharged the AVAA basin.

### Stage Two: Trial of Phelan's Remaining Preserved Claims

The court then scheduled a trial for Phelan's remaining claims for August 2015.[9] Phelan delineated those remaining claims as seeking declarations (1) as to its alleged appropriative rights as a municipal water provider (fourth cause of action), (2) as to its "storage" rights for imported water (fifth cause of action), and (3) as to the alleged unreasonable use of water by other cross-defendants (seventh cause of action). Phelan also sought a determination, on its third cause of action for a Physical Solution, that any Physical Solution should allow Phelan to pump up to 1,200 afy without payment of any Replacement Assessment Fee.[10] Prior to this Stage Two trial, Phelan "reserved" its right to present evidence on its "unreasonable use of water" claim and indicated it would present that evidence at the pending "prove-up" hearings on the proposed Physical Solution. Accordingly, Phelan framed the issues for the Stage Two trial to be limited to whether Phelan had appropriative rights as a municipal water provider and whether any Physical Solution should allocate certain amounts of pumping to Phelan free of any replacement assessment.

---

[9]The court's scheduling order also set an evidentiary hearing on a proposed Physical Solution for the fall of 2015.

[10]Although Phelan also indicated (prior to the Stage Two trial) that it intended to pursue its eighth cause of action for a declaration of the boundaries of the AVGB, it later expressly stated this cause of action did not seek to *revise* the AVAA boundaries established in Phase 1, but was instead limited to seeking a determination that it was not an "exporter" of the water it drew from Well 14.

At this Stage Two trial, Phelan made a brief evidentiary presentation from its expert hydrologist on the claims set for hearing.[11] At the close of Phelan's evidence phase, a PWS party moved for judgment under Code of Civil Procedure section 631.8, but the court deferred ruling on the motion until it could hear further evidence scheduled to be heard during the Phase 6 trial on the Physical Solution.

### Phase 6:  The Physical Solution

In the spring of 2015, the settling parties presented a stipulation containing a proposed plan, the Physical Solution, for the entire AVAA, which was agreed upon by the vast majority of the parties to the consolidated actions.  Phelan was not among the parties to the stipulation.  The proposed judgment contained an allocation of the projected safe yield among the numerous parties.  Although the proposed judgment did not allocate any share of the available native safe yield to Phelan, it did specify Phelan could continue to pump up to 1,200 afy from Well 14 for use outside the AVAA as long as such pumping did not cause "material injury" to the AVAA and Phelan paid a replacement water assessment for the amounts it extracted from Well 14 and distributed outside the AVAA.

In the fall of 2015, the court held hearings on the proposed Physical Solution.  After hearing evidence from a historian on the public notoriety of the overdraft conditions in the area,[12] the court heard evidence from four experts concerning the

---

[11]Harder identified six wells used by Phelan to pump water from the AVGB, although only one of those wells (Well 14) was within the AVAA.  He also described the amounts of water Phelan distributed to the portion of their customers who, although outside the AVAA, were atop a portion of the alluvial basin as defined by the Department of Water Resources' Bulletin 118.  He also testified Phelan's pumping has had no measurable impact on the groundwater levels within the Buttes subbasin, and that groundwater levels within the Buttes subbasin has remained relatively stable.  However, Harder conceded that water pumped from Phelan's wells intercepted water that would otherwise flow as recharge into the AVAA basin.

[12]Dr. Douglas Littlefield, a forensic historian, testified to a long history of published articles and technical studies showing the overdraft of water and resulting diminishing water

14.

proposed Physical Solution. Dr. Dennis Williams, an expert with extensive experience with groundwater hydrology, opined the proposed Physical Solution would bring the AVAA basin back into balance because of its component parts: substantial reductions in pumping by existing users, importation of supplemental water, and the management and monitoring provisions. Charles Binder, a civil engineer who acted as a watermaster for another watershed, similarly testified the provisions of the judgment and proposed Physical Solution would bring the AVAA basin back into hydrologic balance. Two other experts opined the parties who received production rights under the Physical Solution were devoting the water they extracted to reasonable and beneficial uses.

Phelan presented no affirmative evidence during the Phase 6 trial. Phelan's Phase 6 trial brief did assert that, based on the evidentiary record, the court should make numerous modifications to the proposed Physical Solution. Specifically, it argued it should be allowed to pump up to 1,200 afy *without* the replenishment assessment contemplated by the Physical Solution or, alternatively, to pump 700 afy without a replenishment assessment, based on its historical pumping from all its wells (including its wells outside the AVAA boundaries) within the Buttes subbasin and the impacts of its pumping upon water levels within that subunit.[13] It also asserted the judgment should recognize appropriative pumping rights held by Phelan were entitled to be accorded municipal priority under sections 106 and 106.5 of the California Water Code.[14]

---

levels in the areas encompassed by the AVAA (as well as attendant subsidence problems) were well known for decades.

[13]Phelan's Phase 6 trial brief also opposed certain language within the proposed Physical Solution, including characterizing Phelan as an "exporter" of water, and to the ambiguity created by certain "costs" language contained in paragraph 6.4.1.2 of the Physical Solution.

[14]Phelan apparently presented no evidence in support of its claim there was an unreasonable use of water by other cross-defendants and, while Phelan interposed objections to the proposed statement of decision, its objections contained no mention of this claim.

15.

The court's Phase 6 proposed statement of decision concluded, as to Phelan's remaining claims, that Phelan lacked an appropriative right to draw water from the AVAA because the longstanding overdraft conditions in the AVAA basin as a whole meant there was no surplus water available for Phelan to acquire or enlarge an appropriative water right. It further rejected Phelan's return flow claims because such a claim is limited to return flow from imported water, and Phelan never imported water into the AVAA.

***The Final Judgment and Adoption of the Physical Solution***

The court's final judgment, which incorporated determinations from prior phases, found the collective demands by those holding water rights in the AVAA basin exceeded the available total safe yield of 110,000 afy (comprising a native safe yield of 82,300 afy and the balance coming from imported supplemental water supplies) for the entire basin, and that a comprehensive adjudication of all of the water rights within the AVAA basin and a water resource management plan was required to prevent further depletion of and damage to the AVAA basin. The court found (1) the United States had produced substantial evidence establishing a federal reserved water right, (2) the PWS had produced substantial evidence showing they had acquired a prescriptive right as against certain parties who had not joined in the stipulated judgment, and (3) Phelan had not shown it had acquired an appropriative water right (or any other right) in the AVAA basin's safe yield. Specifically, the court noted that, while Phelan was an overlying landowner in the AVAA basin by virtue of its ownership of the parcel on which it operated Well 14, the water it drew from that parcel was not used for that parcel but was instead used to service its customers outside the AVAA. Its final judgment approved Phelan's ability, as granted by the approved Physical Solution, to pump up to 1,200 afy subject to the payment of a replacement assessment, and found Phelan had no right to pump water from the AVAA except under the terms of that Physical Solution.

16.

The court further found that the stipulating "Landowner Parties" and "Public Overliers" had established they possessed overlying rights to the basin's native safe yields by producing evidence of the amounts of the basin groundwater they actually used, that such amounts were reasonable and beneficial uses of such water, and that the total amounts so used exceeded the total native safe yield.[15] The court also granted final approval to a settlement for the "Small Pumper Class," which allocated certain production rights to members of that class.

The court found that, because the native safe yield was well below the amounts used for reasonable and beneficial purposes by those with overlying, prescriptive, or reserved rights, it was necessary to allocate the native safe yield among these rights holders to protect the AVAA basin for existing and future users. The court concluded the evidence presented during Phases 4 and 6 supported the conclusion that the Physical Solution, which required these rights holders to severely reduce the amount of water they used and created an overarching water management plan for the AVAA basin, fairly allocated the available water supplies and made the maximum reasonable and beneficial use of the native safe yield in a manner which would protect the AVAA basin for existing and future users while preserving the ability of existing rights holders to continue using the available water.

---

[15]The court made similar findings as to a group of nonstipulating landowner parties who claimed overlying rights in the basin's groundwater by proof of their land ownership or other interest in the basin. While this group was not signatories to the original settlement, they supported the proposed judgment and Physical Solution and agreed to reduce production under paragraph 5.1.10 of the Physical Solution to certain specified amounts. The court found these parties had shown they had an overlying right to basin water, that they had reasonably and beneficially used basin water, and that the amounts they were allocated under the Physical Solution was a severe reduction of their historical and current uses and represented amounts they applied to reasonable and beneficial uses.

17.

# DISCUSSION

## I. Substantial Evidence Supports the Conclusion the Physical Solution Will Bring the AVAA Basin Into Balance*

A court may impose a physical solution to protect an aquifer from the deleterious effects of overdrafting the aquifer. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 288.) "A physical solution is an equitable remedy designed to alleviate overdrafts and the consequential depletion of water resources in a particular area, consistent with the constitutional mandate to prevent waste and unreasonable water use and to maximize the beneficial use of this state's limited resource." (*California American Water v. City of Seaside* (2010) 183 Cal.App.4th 471, 480.) A court's physical solution can reasonably regulate the use of the water by the respective rights-holders provided its provisions are "adequate to protect the one having the paramount right in the substantial enjoyment thereof and to prevent its ultimate destruction …." (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 383 (*Peabody*).) A physical solution must consider the rights and priorities of the vested rights holders in light of the constitutional principle requiring that available water be put to beneficial use to the fullest extent possible. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1250 ["although it is clear that a trial court may impose a physical solution to achieve a practical allocation of water to competing interests, the solution's general purpose cannot simply ignore the priority rights of the parties asserting them. [Citation.] In ordering a physical solution, therefore, a court may neither change priorities among the water rights holders nor eliminate vested rights in applying the solution without first considering them in relation to the reasonable use doctrine"].)

Phelan argues on appeal there is no substantial evidence to support the trial court's finding that the adopted Physical Solution would bring the AVAA into hydrological

---

*See footnote, *ante*, page 1.

18.

balance and thereby "prevent its ultimate destruction." (*Peabody*, *supra*, 2 Cal.2d at p. 383.)

> "Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that … the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

The testimony of a single witness, unless it is impossible or inherently improbable, will be sufficient to support the challenged findings. (*Sonic Manufacturing Technologies*, *Inc. v. AAE Systems*, *Inc.* (2011) 196 Cal.App.4th 456, 465–466.) When a party asserts on appeal that a judgment lacks substantial evidentiary support, it is that party's burden to summarize the evidence on that point—both favorable and unfavorable—and then to demonstrate how and why it is insufficient. (*Huong Que*, *Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

Phelan's insufficient evidence claim rests principally on the contention the testimony of two experts, which was offered by the proponents of the Physical Solution in Phase 6 of the underlying trial, does not provide sufficient evidence the Physical Solution would bring the AVAA into balance. The first expert, Mr. Binder, had extensive training and experience in water resource management and who (among other qualifications) served as the watermaster and the watermaster engineer to administer and enforce a similar physical solution for the Santa Margarita Watershed. Binder premised his opinion on a review of the terms of the proposed Physical Solution, the technical reports from a variety of agencies, and the court's orders and decisions in the prior phases of the AVGC litigation. Based on his review of all these materials, Mr. Binder opined (1) the Physical Solution would result in reduced groundwater production to a level equal to

the amount of the safe yield resulting in the basin being stabilized into hydrologic balance, (2) the native safe yield plus available supplemental water supplies would be sufficient to meet total current water requirements under the allocations contemplated in the Physical Solution, and (3) the proposed judgment and Physical Solution would create a functional structure for administering the judgment and managing the groundwater basin. Binder noted the management structure included a watermaster and watermaster engineer to manage the groundwater basin, a financial plan to fund the management structure, flexible management tools to manage the basin, and retention of court jurisdiction to enforce or modify the judgment.

Dr. Williams, an expert geologist, hydrogeologist and groundwater hydrologist, and an expert on groundwater modeling and management, also concluded the proposed Physical Solution would bring the AVAA basin into hydrologic balance. Dr. Williams formed his opinion using a computer model created by the United States Geological Survey, known as a "distributed parameters" model, which he used to assess the impacts of pumping and recharging within the mapped area.[16] Dr. Williams used the model to project the impacts on the AVAA's hydrologic balance over the next 50-year period using multiple different scenarios. His first two scenarios (scenarios 1 and 1A) modeled and evaluated the long-term impacts on the AVAA basin *without* reduced pumping by

[16]Williams explained that, before the "distributed parameters" computer model was available, hydrologists used a "lumped parameter" model that treated the entire basin as a giant bathtub in which total inflows and outflows were used to assess storage changes. In contrast, the distributed parameters model creates a fine mesh (comprising over 60,000 individual micro-parcels or "cells" measuring 1,000 by 1,000 meters per cell with each cell having several vertical layers to reflect the depths of the relevant geological features), which was overlaid on the AVAA basin to more finely evaluate the impacts of pumping and recharge and "solve" water balances for each of the cells. The United States Geological Survey model covered a much greater area than the AVAA, so only the cells relevant to evaluating the proposed Physical Solution (primarily the cells covering the alluvial sediments in the AVAA) were activated for purposes of running the computer modeling. The model allowed Williams to input the amount of pumping for each individual pumper (whether reduced or unreduced) and assign it to a particular "cell" of the map where that pumper was operating the specific pump.

current users as contemplated by the proposed Physical Solution: scenario 1 assumed unreduced current pumping with aquifer recharge under drought conditions (where the rain and imported water recharging the AVAA basin was constricted), while scenario 1A again assumed unreduced current pumping but under average conditions where rain and imported water recharged the aquifer with the 110,000 afy of safe yield. Based on the model, he concluded either scenario would cause adverse impacts on the AVAA basin.

Dr. Williams then used the computer model to calculate the projected long-term impacts on the AVAA basin if the reduced pumping (and other measures) contemplated by the proposed Physical Solution were adopted using two more scenarios (scenarios 2 and 2A), again using parallel aquifer recharge assumptions under drought conditions (scenario 2) and under average recharge conditions (scenario 2A). Dr. Williams concluded that implementing the terms of the Physical Solution, in which existing rights holders reduced their pumping over a specified period, *would* stabilize the AVAA's hydrological balance under either scenario 2 or 2A.

Dr. Williams subsequently ran a computer modeling (which he denominated as scenario 2B) to simulate the impact on the AVAA of Phelan's pumping from Well 14 of 1,200 afy under the average recharge conditions employed in scenario 2A. He concluded such pumping from Phelan's Well 14 would cause the AVAA to have a net loss to the AVAA groundwater supplies of 700 afy.

The testimony of Binder and Williams provides ample evidence to support the finding the Physical Solution prevented the "ultimate destruction" of the AVAA basin while providing protections for the parties with paramount rights to substantially enjoy the available supplies in that basin. (*Peabody*, *supra*, 2 Cal.2d at p. 383.) However, Phelan asserts Dr. Williams's testimony must be disregarded in evaluating the evidentiary support for that finding because the methodology employed in his computer modeling was flawed. Specifically, Phelan asserts (1) not all of the cells in the United States Geological Survey model within the AVAA were "activated," (2) there were no

"calibration wells" in the area near Phelan's Well 14, and (3) the modeling of the impact of pumping from Well 14 was done by moving its location to the nearest "active" cell in order to simulate such impacts. Accordingly, argues Phelan, Dr. Williams's testimony cannot provide substantial evidence for the findings the Physical Solution would stabilize the AVAA basin and bring it into hydrologic balance because the model did not "accurately depict the workings of the groundwater basin." We reject Phelan's claim that Williams's opinion must be disregarded in assessing whether substantial evidence supports the trial court's finding for two reasons. First, Phelan acknowledges its motion to strike Williams's testimony, which appears to have been based on essentially the same alleged imperfections in the modeling, was denied by the trial court. Phelan makes no effort on appeal to satisfy its burden of showing the denial of its motion to strike Dr. Williams's testimony was an abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion"].) Because we may not interfere with the broad discretion accorded to trial courts in admitting expert testimony absent a showing such discretion was clearly abused (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196), and Phelan has made no showing such discretion was clearly abused here (cf. *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281), we must presume the ruling on the motion to strike was properly denied and that the trial court therefore properly admitted and considered his testimony. Second, while Phelan makes multiple suggestions on appeal on how Williams's computer modeling could have been more precise or comprehensive, Phelan cites no evidence those suggested improvements to the model (even if implemented) would have materially changed the results reached by the model (or Dr. Williams's opinion based thereon) that the Physical Solution would stabilize the AVAA basin's hydrological balance under either scenario 2

or 2A, or would have altered his opinion that pumping from Phelan's Well 14 would cause the AVAA to have a net loss to the AVAA groundwater supplies of 700 afy.

Because Phelan has not demonstrated that admitting Dr. Williams's testimony was an abuse of discretion, nor does the record contain evidence that any imperfections in the model so materially impacted his conclusions that his testimony (as admitted) should be entirely disregarded on appeal, Dr. Williams's opinion provides ample support for the judgment. Other courts that have considered arguments attacking an expert's testimony, analogous to those mounted by Phelan here, have similarly rejected such arguments on appeal. For example, in *Corona Foothill Lemon Co. v. Lillibridge* (1937) 8 Cal.2d 522, the appellants challenged whether there was substantial evidence for the trial court's determinations of the boundaries of the aquifer, and supported that challenge by detailing the evidence at trial supporting a contrary conclusion. The court, noting there was "voluminous evidence of a highly conflicting nature [and] [w]ell qualified witnesses on each side testified concerning the geology of the area, its hydrology, and the relative permeability of soils in Temescal wash, on Norco mesa, and on the Corona slope" (*id.* at p. 527), rejected the appellate claim. The *Corona* court observed the evidence created "… substantial points of agreement and also decided points of material disagreement [among the experts on] whether the entire Corona area constitutes a single underground water basin or reservoir" (*id.* at p. 528) but rejected the appellants' claim because, while the appellants' contrary claims had evidentiary support, "… there is in contradiction of [the appellants'] evidence ample proof which, if believed by the trial court, supports its conclusion that the underground reservoir embraces the entire Corona area." (*Ibid.*; accord, *Allen v. California Water and Tel. Co.* (1946) 29 Cal.2d 466, 481 [expert testimony on absence of surplus for appropriation; court rejects substantial evidence challenge because "the trial court's findings have substantial evidentiary support in the testimony of [expert] Lee and other witnesses for plaintiffs; [the appellate] attacks made by defendant upon the testimony of Mr. Lee go only to its credibility and weight; and …

23.

these are matters committed to the trier of the facts for determination in the case of an expert as well as of lay testimony"].)

Moreover, even assuming Phelan *had* adequately carried its appellate burden demonstrating it was a clear abuse of discretion to admit Dr. Williams's testimony, the testimony of Mr. Binder would alone provide substantial evidentiary support for the finding the panoply of provisions in the Physical Solution would bring the AVAA into hydrological balance. Although Phelan attacks Binder's opinions on appeal,[17] Phelan did not move to strike Binder's testimony below, nor does it articulate (apart from a peremptory allegation that his testimony must be deemed "irrelevant") why his testimony does not provide substantial evidence to support the trial court's conclusion the Physical Solution would protect the AVAA basin from further degradation. Because the testimony of a single witness (unless it is impossible or inherently improbable) is sufficient to support the challenged findings (*Sonic Manufacturing Technologies*, *Inc. v. AAE Systems*, *Inc.*, *supra*, 196 Cal.App.4th at pp. 465–466), and Phelan has not shown Binder's opinion was either impossible or inherently improbable, Binder's opinion alone provides substantial evidentiary support for the conclusion the Physical Solution would bring the AVAA into hydrologic balance.

Phelan appears to argue our ordinary assessment of whether there is any substantial evidence to support the findings below (*Crawford v. Southern Pacific Co.*, *supra*, 3 Cal.2d at p. 429), and which requires us to view the evidence in the light most favorable to the judgment with every reasonable inference drawn in favor thereof (*Jessup Farms v. Baldwin*, *supra*, 33 Cal.3d at p. 660), is inapplicable here because Phelan contends the final statement of decision affirmatively shows the court's determinations

---

[17]Phelan points out, for example, that certain numbers used in Binder's analysis changed between the time he gave his deposition and the time of his trial testimony, and also claims Binder's analysis considered nongroundwater sources in alleged contravention of a limiting determination from the Phase 1 trial.

24.

were *not* based on a weighing of the conflicting evidence. Specifically, Phelan argues the final statement of decision does not catalogue each item of evidence accepted or rejected by the court (and the rationale for each such acceptance or rejection) in reaching its final determinations, and that this lacuna shows the court reached its determinations without weighing the evidence. Based on this predicate—the claim the record affirmatively shows the decision was *not* based on a weighing of the evidence—Phelan asserts we are precluded from employing the deferential substantial evidence standard to review its decision under *Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474 (*Kemp*) and *Affan v. Portofino Cove Homeowners Assn.* (2010) 189 Cal.App.4th 930 (*Affan*).

However, Phelan's contention that alleged deficiencies in the final statement of decision requires application of some standard of review other than the deferential substantial evidence standard is first raised in Phelan's reply brief. Ordinarily, "'[p]oints raised for the first time in a reply brief will … not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' [Citation.] … '"Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before."' [Citation.]" (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

Even assuming Phelan had preserved this argument, it rests on a predicate that misconceives what is required in a statement of decision. Phelan's argument under *Kemp* and *Affan* is predicated on its assertion that a statement of decision which does not contain a detailed discussion of all of the evidence *and* a discussion of why the court chose to credit some evidence while rejecting other evidence affirmatively shows the

25.

court did *not* weigh the evidence in reaching its decision. However, a statement of decision is required only to set out ultimate findings rather than evidentiary ones. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.) A trial court "'is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379–1380; [citation].) 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.) 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' (*Ibid.*) Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.' (*Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525.)" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.) Phelan's argument "would require the court to make detailed findings of evidentiary facts as to each individual piece of evidence relied upon by the trial court. Under the law, [Phelan is] not entitled to such a detailed analysis." (*People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119, 128.) Here, the statement of decision fairly disclosed the court's determination as to the ultimate facts and material issues in dispute in each phase of the proceedings. Accordingly, we reject Phelan's claim the statement of decision was too inadequate to warrant review under the substantial evidence standard.[18]

---

[18]This analysis renders moot Phelan's reliance on *Kemp* and *Affan*. In both of those cases, the record affirmatively showed the trial court's judgment was based on reasons unrelated to an assessment of the conflicting evidence. In *Kemp*, for example, a prime contractor sued a subcontractor for breach of contract and sought a pretrial right to attach order against the subcontractor's accounts receivable, which required an affirmative showing by the prime contractor of the "probable validity" of its breach of contract claim. The court granted the attachment order, but the minute order and reporter's transcripts showed the court granted the order *not* because the plaintiff had affirmatively shown the probable validity of its claim, but because it ruled the defendant was barred (by collateral estoppel principles) from contesting the

Phelan's final attack on the evidentiary support for adopting the Physical Solution appears to argue the evidence was insufficient because there was no evidence Phelan's pumping "substantially harms the AVAA such that Phelan should be required to pay a replacement assessment" for the amounts it pumps. However, there is substantial evidence Phelan's pumping harms the AVAA basin's water balance. Dr. Williams testified Phelan's pumping diminished the AVAA water balances by 700 AF each year, and Phelan's own expert agreed Well 14 extracts more water *from* the AVAA basin than was being returned *to* the AVAA basin from return flows from those extracted waters. This final argument by Phelan appears to suggest that, as long as the negative impacts of its pumping on the AVAA basin do not *substantially* harm the AVAA basin, there is no evidence supporting the Physical Solution's regulation of its pumping. However, Phelan cites no authority that a court lacks evidentiary support for a Physical Solution merely because any *one* party regulated thereunder can argue that exempting *its* pumping from its terms would only minimally diminish the effectiveness of the Physical Solution. (Contra, *City of Lodi v. East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316, 341 [trial court has power and duty to admit evidence relating to possible physical solutions and "to enforce such solution regardless of whether the parties agree"].) Indeed, we believe this

---

plaintiff's breach of contract claim. (*Kemp*, *supra*, 146 Cal.App.4th at pp. 1476–1481.) The appellate court, concluding the trial court erred by using collateral estoppel on the probable validity issue, also rejected invoking substantial evidence review to affirm the determination on the probable validity issue because it was clear the court never considered or weighed any evidence once it determined (erroneously) collateral estoppel obviated examination of that issue. (*Id*. at pp. 1477–1478.) Similarly, in *Affan*, *supra*, 189 Cal.App.4th 930, the trial court rejected an owner's claim of negligence against a homeowners association because it apparently misconstrued a fact-based "judicial deference" defense (available to associations under *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249) as a blanket immunity defense (*Affan*, *supra*, at pp. 938–940), and therefore never examined whether the requisite facts had been established to invoke that judicial deference defense. (*Id.* at pp. 940–944.) Unlike those cases, the statement of decision here does not show the approval of the Physical Solution was based on matters dehors the evidence (as in *Kemp*) or on erroneous legal standards (as in *Affan*), but was instead based on correct legal considerations and after considering the evidence. Accordingly, neither *Kemp* or *Affan* is relevant here.

argument (if credited) would eviscerate the ability of a court to adopt *any* basin-wide physical solution: if any single water rights holder could bar adoption of a proposed physical solution unless it was exempted from it by asserting its specific unconstrained pumping would have limited impact on the effectiveness of its remaining regulations, *any* proposed physical solution could be exposed to a "death by a thousand cuts" because each objecting water claimant could likewise claim exemption from its regulation under the "individual de minimus impacts" argument.

We conclude Phelan has not carried its appellate burden of showing there was inadequate evidence to support the conclusion the Physical Solution adequately met the twin goals of protecting the paramount rights of vested water rights holders while preventing the ultimate destruction of the AVAA aquifer (*Peabody*, *supra*, 2 Cal.2d at p. 383), and we therefore reject Phelan's first argument on appeal.

## II. The Trial Court Correctly Rejected Phelan's Fourth Cause of Action Asserting It Had Acquired Water Rights as a "Public Use Appropriator"

Phelan's cross-complaint, in addition to asserting it had acquired protectable water rights either as an appropriator (if surplus water existed) or by prescription (if there was not surplus water), also asserted it had "rights to pump water from the Basin to meet its municipal water demands … as a matter of law and public policy" under California Water Code sections 106 and 106.5, which Phelan contended provided it with a "prior and paramount right to Basin water as against all non-municipal uses." The trial court's final statement of decision concluded Phelan had not acquired *any* right, whether appropriative or otherwise, to AVAA basin groundwater. On appeal, Phelan appears to assert the "public use" doctrine and policies embodied in Water Code sections 106 and 106.5 confer on Phelan a right—as a municipal appropriator for public use—to pump water from the AVAA for municipal purposes *regardless* of whether a surplus existed when it began pumping from Well 14.

28.

California's "dual system of water rights"[19] essentially provides two sources by which water rights in *surface* waters can be acquired:  by riparian rights holders who have first priority to the available water for riparian uses, or by appropriation of water for nonriparian uses when there is water in surplus beyond that used by first priority users. (See generally *Santa Barbara Channelkeeper v. City of San Buenaventura* (2018) 19 Cal.App.5th 1176, 1183.)

> "Similar principles govern rights to water in an underground basin.  First priority goes to the landowner whose property overlies the groundwater. These 'overlying rights' are analogous to riparian rights in that they are based on ownership of adjoining land, and they confer priority.  [Citation.] Surplus groundwater also may be taken by an appropriator, and priority among 'appropriative rights' holders generally follows the familiar principle that '"the one first in time is the first in right."'  (*City of Barstow v. Mojave Water Agency*, *supra*, 23 Cal.4th] at p. 1241.)  With groundwater there is an exception, however, that gives rise to a third category of rights. Under certain circumstances, an appropriator may gain 'prescriptive rights' by using groundwater to which it is not legally entitled in a manner that is '"actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right."'  (*Ibid.*)"  (*Santa Barbara Channelkeeper v. City of San Buenaventura*, *supra*, at p. 1184.)

Phelan does not assert its pumping from Well 14 is pursuant to the exercise of rights it holds either as an overlying landowner or by prescription.  Accordingly, assuming the court correctly rejected Phelan's claim there was surplus water upon which Phelan could have acquired protectable rights in the final recognized category of water rights (i.e., as an appropriator of surplus water), Phelan lacks any cognizable groundwater

---

[19]Although courts generally refer to the "dual system" of water rights, the courts have acknowledged that "California's water rights system is not really dual but is instead tripartite, because some pueblo rights superior to riparian or appropriative rights exist."  (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 423, fn. 3.) Because the pueblo rights overlay is not implicated by Phelan's appeal, we employ the "dual system" nomenclature and principles in evaluating its appeal.

rights in the AVAA.[20]  Phelan's "public use appropriator" argument instead posits there is *another* possible source for acquiring protectable rights to groundwater:  that even *without* a surplus upon which Phelan could premise a claim as an appropriator, Water Code sections 106 and 106.5 and a variety of cases have created a public-policy-based alternative upon which Phelan could have acquired a protectible interest in the aquifer.

We conclude neither Water Code sections 106 and 106.5 nor the cases cobbled together by Phelan provides support for this novel theory that a pumper for municipal purposes can tap into an overdrafted aquifer and in doing so acquire protectable water rights in that aquifer.  While the statutes cited by Phelan are declarative of general public policy,[21] Phelan has cited no case (nor have we located any) in which those sections were employed to acquire a water right that would not otherwise have been acquired under the laws governing acquisition of water rights by overlying, appropriative, or prescriptive users.  Instead, those sections appear to only be relevant to assigning and protecting priorities among *existing* water rights holders.  (See, e.g., *Deetz v. Carter* (1965) 232 Cal.App.2d 851 [dispute among riparian rights holders resolved with domestic user given priority over irrigator].)  Because those sections appear limited to assigning and protecting priorities, and the same legislative enactment which created those includes the express declaration that "[i]n the enactment of this code the Legislature does not intend thereby to effect any change in the law relating to water rights" (Wat. Code, § 103), we reject Phelan's argument these sections create a special avenue by which municipal water suppliers can acquire a correlative appropriative right in an overdrafted aquifer.

---

[20]In the unpublished portions of this opinion, we conclude the trial court did not err when it concluded there was no available surplus upon which Phelan could premise a claim as an appropriator.

[21]Water Code section 106 merely states that it is "the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation."  Section 106.5 states only that it is "the established policy of this State that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for existing and future uses."

The cases cited by Phelan are equally inapposite to its argument. For example, while Phelan relies heavily on *Peabody*, *supra*, 2 Cal.2d 351 for its "appropriat[ion] for public use" argument, *Peabody*'s legal relevance is limited. There, the riparian owners sued a public agency for impairing their rights to river water after the agency had completed a dam and began impounding river water (for diversion to municipal uses), thereby reducing the water available to the downstream riparian owners. The trial court concluded the downstream owners were entitled to all of the waters from the stream and enjoined the agency from impounding waters behind the dam. (*Id*. at pp. 358–363.) The *Peabody* court merely concluded that, because the public use had commenced before the plaintiffs commenced their action to establish their water rights, the plaintiffs could not enjoin the agency from continuing to operate the dam, but were instead limited to other remedies, such as recovering any appropriate damages or to a physical solution minimizing or eliminating any damages otherwise recoverable. (*Id*. at pp. 377–380.) We conclude *Peabody* does not hold a public agency can *acquire* an appropriative water right merely by constructing and operating facilities diverting water for public use, but instead merely delimits the *remedies* which might be available when such activity by the public agency injures the rights held by paramount water rights holders.[22]

The other cases relied on by Phelan are equally inapposite. (See, e.g., *Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 535–538 [discussing availability of *injunctive* relief against public use appropriator]; *Hillside Water Co. v. City of Los Angeles* (1938) 10 Cal.2d 677, 688 [same]; *Wright v. Goleta Water Dist.* (1985) 174 Cal.App.3d 74, 90 ["Intervention of a public use does not bar suit by the owner of a water

_____

[22]*Peabody* is also factually distinguishable. There, the agency had already completed a dam and began impounding river water before the riparian owners filed suit to establish their paramount water rights. (*Peabody*, *supra*, 2 Cal.2d at p. 377.) Here, while Phelan had acquired the parcel on which it constructed Well 14 before commencement of the AVGC litigation, the litigation commenced before it began operating its well. Thus, unlike *Peabody*, the public use here did not commence until *after* the action to establish water rights in the AVAA was underway.

31.

right; it merely limits his remedy to damages in place of an injunction"].)  Neither these cases, nor Phelan's remaining authorities, provides any additional support for its claim that the municipal priority sections of the Water Code create an independent avenue for acquiring water rights in an overdrafted aquifer.[23]

We conclude neither the cited Water Code sections nor the case law supports Phelan's argument a public agency may acquire appropriative rights in water from an aquifer absent a surplus in that aquifer to which appropriative rights can attach.

## III.    The Phased Decisional Procedure Did Not Deprive Phelan of Due Process[*]

Phelan appears to argue it was deprived of its due process rights because of the order in which issues were resolved in the trial court's phased proceedings.  Phelan specifically asserts the court erred when it determined (during the Phase 3 trial) the AVAA basin was in overdraft while deferring the subsidiary determination of whether the water use by all water users in the AVAA basin (whether overlying owners, prescriptive rights holders, or prior appropriators) were for reasonable and beneficial uses.  This alleged error, asserts Phelan, deprived it of its due process right to show there was surplus water upon which Phelan could premise its claim to an appropriative water right.  Phelan also appears to argue the court erroneously placed on Phelan the burden to show there was unreasonable water uses by claimants with priority over Phelan that

---

[23]For example, Phelan states that "'[p]ublic use of percolating water is a nonoverlying use, whether the lands that receive such public service are overlying lands *or whether they are located outside of the ground-water area.  Such public use is therefore an appropriative use of the water*.'"  (Quoting Hutchins, The California Law of Water Rights (1956) p. 458, italics and boldface supplied by Phelan.)  While this accurately describes what *is* an "appropriative use," it is an excerpt taken from Hutchins's overall discussion on the "Appropriation of Surplus Percolating Waters," which cautions that "[i]t is surplus or excess waters above the quantities to which the paramount rights of the overlying owners attach that are subject to appropriation for nonoverlying uses."  (*Id*. at p. 454.)  Thus, Hutchins's description of one *type* of appropriative use (public use outside the groundwater area) does not obviate the predicate *for* acquiring protectable appropriative user rights:  the *existence* of surplus water above that water which is subject to paramount rights holders.

[*]See footnote, *ante*, page 1.

32.

might have (if eliminated) provided surplus water available for appropriation by Phelan. Before we can evaluate Phelan's claims of procedural error, we must outline the substantive law the trial court was required to apply in the proceedings below.

A. **General Principles: Overlying/Appropriative/Prescriptive Rights, the Significance of "Surplus" and the "Reasonable and Beneficial Use" Limitations on Water Use**

As previously discussed, California's "dual system of water rights" in water courses contemplates two sources by which water rights can be acquired: by riparian rights (water rights held by virtue of owning land adjacent to or through which flowing water passes to use the water for such owned lands) or by appropriative rights (water rights held from diverting and using such water for the benefit of noncontiguous lands). (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1477–1478.) As between riparian rights holders and appropriative rights holders, the former group has paramount priority to the available water in times of shortages. (*Id*. at p. 1478.)

Analogous principles apply to water from aquifers: rights can be held by an overlying landowner (who has paramount priority to use the water to benefit the owned land analogous to a riparian owner) or by an appropriator if there is surplus water above the needs of paramount claimants. (See generally *Santa Barbara Channelkeeper v. City of San Buenaventura*, *supra*, 19 Cal.App.5th at pp. 1183–1184.) In the case of aquifers, however, there is an exception giving rise to a possible third category of rights: an appropriator may (under certain circumstances) gain "prescriptive rights" by using groundwater to which it was not legally entitled if the ordinary elements of prescription are satisfied. (*Ibid*.)

The key issue in deciding whether a party has acquired a protectable *appropriative* right is the existence of a "surplus," i.e., whether there was water beyond the amounts needed by paramount rights holders. (*City of Barstow v. Mojave Water Agency*, *supra*, 23 Cal.4th at pp. 1240–1242 ["'Any water not needed for the reasonable beneficial use of

those having prior rights is excess or surplus water and may rightly be appropriated on privately owned land for non-overlying use, such as devotion to public use or exportation beyond the basin or watershed'"].)  The converse concept is overdraft:  when the withdrawals from the aquifer exceed the available recharge, there is no surplus but there is instead overdraft.  (*City of Los Angeles v. City of San Fernando*, *supra*, 14 Cal.3d at pp. 277–278, disapproved on other grounds in *City of Barstow*, *supra*, at p. 1248 ["Overdraft commences whenever extractions increase, or the withdrawable maximum decreases, or both, to the point where the surplus ends.  Thus, on the commencement of overdraft there is no surplus available for the acquisition or enlargement of appropriative rights.  Instead, appropriations of water in excess of surplus then invade senior basin rights"].)

An overlay to this dual system for defining water rights is a key limiting principle: the rule of reasonableness.  (*Santa Barbara Channelkeeper v. City of San Buenaventura*, *supra*, 19 Cal.App.5th at p. 1184.)  There is an "overriding constitutional limitation that the water be used as reasonably required for the beneficial use to be served." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 105.)  The rule of reasonableness means that paramount rights holders, while entitled to priority for water devoted to their reasonable and beneficial uses, may not be so profligate with their uses of available water that they deprive others of water that would otherwise be "surplus" and hence available for appropriation.  As articulated by *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908:

> "[I]t is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. [Citations.]  Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority.  [Citation.]  *Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water …,* [which] water may rightfully be appropriated

34.

on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed." (*Id.* at pp. 925–926, italics added.)

## B. Analysis

Phelan's due process claim on appeal, while imprecise, appears to have two embedded claims of prejudicial error. First, Phelan argues it was error to determine during the Phase 3 proceedings that the AVAA basin was in overdraft based on a comparison of current extractions against the average safe yield, while bifurcating and deferring to later stages whether the current extractions by all other water users in the AVAA basin qualified as reasonable and beneficial uses for such extracted water. Second, Phelan appears to argue the trial court's delimitation of the issues determined in Phase 3 somehow foreclosed Phelan from proving its claim that there was (or could have been) a surplus which Phelan could pump as an appropriator, and erroneously placed on Phelan the burden of showing there was a surplus available for appropriation by Phelan.

A trial court has discretion to determine the order in which claims or issues are bifurcated and determined, and the selection and scheduling of those phased determinations will not be disturbed absent an abuse of that discretion. (See generally *Orange County Water Dist. v. Alcoa Global Fasteners*, *Inc.* (2017) 12 Cal.App.5th 252, 353; *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 163.) The issue bifurcated and resolved in Phase 3 was a core issue common to all of the various actions—whether the AVAA basin was currently in a state of overdraft based on current extractions in light of the safe yield of the aquifer such that judicial intervention was required to provide for managing the aquifer and protecting it against further degradation. We cannot conclude that selecting this core issue for resolution at this earlier stage—whether the AVAA basin *was* in overdraft—was an abuse of discretion.

Indeed, Phelan does not contend on appeal that *selecting* "overdraft" as the issue to be examined in Phase 3 was an abuse of discretion. Instead, Phelan appears to assert the court should have employed a different *metric* for the Phase 3 "overdraft"

35.

determination. Rather than comparing safe yield to current *actual* extractions from the AVAA basin, Phelan argues the court should instead *also* have made the separate determination as part of the Phase 3 trial on whether these actual extractions *exceeded* withdrawals devoted to reasonable and beneficial uses. Phelan contends on appeal that only after the court decided whether "all pumpers [from the AVAA] were pumping for reasonable and beneficial uses" could it then decide whether such pumped amounts were above the safe yield (overdraft) or below the safe yield (surplus). Phelan therefore argues it was an abuse of discretion to defer examining the separate issue of whether current actual extractions exceeded the amounts reasonably and beneficially used by the paramount rights holders.

However, there is no indication Phelan timely objected to the issues as delimited for the Phase 3 trial.[24] Prior to the Phase 3 trial, the court (in connection with its order consolidating all pending actions concerning water claims to the AVAA basin,) ordered a case management conference to hear argument concerning the sequencing of common issues to be heard at the next phase, and proposed the issues for the Phase 3 trial would be limited to "safe yield" and "overdraft" while numerous other issues (including "reasonable and beneficial use of water") would be deferred for later determination. Phelan apparently concurred with the proposal that Phase 3 be focused on "a determination of Basin characteristics including its safe yield and overdraft (past or present)," and there is no suggestion Phelan objected to deferring numerous other questions—including questions about reasonable and beneficial use—to subsequent

---

[24]Although Phelan's reply brief on appeal asserts it did lodge an objection, Phelan's citations to the record rely solely on its objections to the proposed statement of decision following trial of Phelan's second and sixth causes of action, which resolved Phelan's claims for appropriative and return flow rights long after Phase 3 had been concluded. Phelan interposed no timely objection, prior to the Phase 3 trial, that the issues of safe yield and overdraft necessarily required a concurrent determination *during that phase* of whether the water being extracted was being devoted to reasonable and beneficial uses.

phases.[25]  Indeed, rather than objecting or contending there might be evidence showing

the AVAA was *not* in overdraft, Phelan's trial brief for Phase 3 seemed affirmatively to

assert the subbasin most relevant to Phelan (i.e., the Butte subbasin in the southeast

portion of the AVAA where Well 14 was operating) *was* "in overdraft or trending toward

overdraft."[26]  Finally, the record is devoid of any suggestion Phelan sought to proffer

evidence, during this (or any other) phase, that actual extractions exceeded reasonable

and beneficial uses.[27]  Because there is no indication Phelan timely objected to the issues

as delimited for the Phase 3 trial, it may not argue for the first time on appeal that the

discretionary determination on the scope of issues to be resolved in Phase 3 was an abuse

of the trial court's discretion.  (See generally *In re Kevin S.* (1996) 41 Cal.App.4th 882,

885–886; *Consolidated World Investments*, *Inc. v. Lido Preferred Ltd.* (1992) 9

Cal.App.4th 373, 382.)

---

[25]The court, after several case management hearings, eventually ordered the Phase 3 trial would examine whether the basin was in overdraft and specified it "does [not] expect to hear evidence of individual pumping of water by any party within the basin; rather, it expects to hear evidence concerning total pumping and total recharge from all sources."  That same order advised that "[a]ny party requiring further clarification of the issues in this third phase of trial is invited to request such clarification."  Phelan cites nothing suggesting it objected, sought clarification, or otherwise sought to inject the "reasonable and beneficial use" issue into Phase 3.

[26]Phelan's Phase 3 trial brief stated it would "offer evidence that pumping from [Phelan's] six wells located within the Groundwater Basin intercepts groundwater that would otherwise flow to the northwest and into a portion of the Adjudication Area where irrigation pumping by others is occurring.  The evidence indicates, among other things, that the combination of [Phelan's] pumping and downgradient pumping by others has resulted in declining groundwater levels in the Southeast portion of the Adjudication Area, particularly over the past ten years.  Groundwater level trends indicate that overdraft exists in the Southeast area of the Adjudication Area, or will exist in the near future, if groundwater pumping in this area continues at current rates or increases."

[27]Although Phelan did submit a case management statement seeking to clarify whether the issues to be decided in Phase 3 would necessitate testimony from their expert (Harder), none of the subjects on which Harder was proffered purported to address reasonable and beneficial uses of water by other AVAA users.

Phelan also appears to complain it was prejudiced because the Phase 4 trial order originally contemplated, but ultimately omitted, consideration of the "reasonable and beneficial use" question.[28] While Phelan correctly recites the evolution of the Phase 4 "trial issues" order, Phelan cites nothing to indicate it objected to this delimitation of the Phase 4 issues, even though it participated in the lengthy hearing at which the proposed modification was considered and ultimately approved. Accordingly, we must deem any claim of error to be waived. (*In re Kevin S.*, *supra*, 41 Cal.App.4th at pp. 885–886.)

Moreover, even assuming Phelan could assert it was error to exclude "reasonable and beneficial uses" from the Phase 4 trial, Phelan has not demonstrated such error would constitute reversible error. While the Phase 4 trial ultimately *was* limited to quantifying the amounts pumped during the relevant period by the numerous parties (other than the Small Pumper Class and Granite Construction) who claimed pumping rights in the AVAA aquifer, Phelan does not articulate on appeal how deferring the "reasonableness of use" question foreclosed Phelan from *subsequently* demonstrating the existence of waste (as alleged in its seventh cause of action) or the existence of a basin-wide surplus necessary to its second cause of action. Phelan does complain on appeal that its seventh cause of action for "waste, unreasonable use or an unreasonable method of diversion or use" was "never heard," but Phelan does not explain how the delineation of issues in Phases 3 or 4 precluded Phelan from litigating its seventh cause of action. To the

---

[28]The Phase 4 trial order originally described its scope to include determining the "reasonable and beneficial use of water for each parcel to be adjudicated." However, a subsequent proposal was submitted by counsel for the Wood class, and joined by other parties, to winnow the issues to be tried in Phase 4 and limit it to identifying the actual amounts extracted by each claimant (for the relevant years) along with the actual use to which the water was put, while excluding from Phase 4 any litigation over whether such actual use was reasonable as to either the type or manner of use. After extensive discussion among the parties, the Phase 4 order was amended to clarify that the trial would be limited to "the amount of water used by each party and the identification of the beneficial use to which that amount was applied, but will not include any determination as to the reasonableness of that type of use, of the manner in which the party applied water to that use, or any determination of a water right."

contrary, the record shows (after the Phase 3 and 4 proceedings had been concluded) the court held a lengthy hearing to determine which of Phelan's claims should next be scheduled for trial, and ultimately set the Stage One trial to encompass litigation of Phelan's claimed "right to pump water as an appropriator of right, Number one; and Number two, [to] brief and present evidence … concerning [Phelan's] right … as a public producer apart from whether there was a surplus." (Some capitalization omitted.) Phelan was provided adequate opportunity to litigate whether there was available surplus in the AVAA aquifer to support its claim as an appropriator, which could have included the subsidiary issue it now asserts it was foreclosed from litigating: whether elimination of unreasonable or nonbeneficial water uses would have produced a surplus (from the native safe yield) that Phelan could have claimed as an "appropriator." However, Phelan did not introduce any evidence the actual amounts pumped by other users exceeded the amounts reasonably appropriate for the beneficial purposes of those users, much less that such wasteful uses were (in the aggregate) so enormous that eliminating such waste would have reduced reasonable and beneficial uses to below the native safe yield and created a surplus available for appropriation by Phelan. We conclude Phelan was not deprived of the due process opportunity to show unreasonable or nonbeneficial uses.[29]

---

[29]It also appears Phelan could have resurrected and litigated its seventh cause of action on two other occasions. First, after the court ruled on Phelan's causes of action alleging it held water rights as an appropriator of a surplus or as a municipal-uses appropriator, the court held the August 2015 Stage 2 trial for Phelan to present evidence on its "remaining causes of action." Phelan's trial brief for that Stage 2 trial addressed only its third cause of action (for a physical solution), its claim it should have municipal appropriator status, and its eighth cause of action seeking declaratory relief as to the "Antelope Valley Groundwater Basin." Additionally, its evidentiary presentation at that hearing proffered no evidence of "waste." Phelan's trial brief for the August 2015 Stage 2 trial *did* "reserve[] the right to present evidence on its Seventh Cause of Action," which it suggested would be presented during the "prove up hearings" on the Physical Solution scheduled for later that year. While these "prove-up" hearings in Phase 6 provided yet another opportunity for Phelan to introduce evidence supporting its claim of unreasonable use of water, Phelan ultimately disclaimed any effort to present affirmative evidence at the final phase examining the proposed Physical Solution.

The final aspect of Phelan's claim it was denied due process appears to assert the court misallocated the burden of proof by placing the burden on Phelan to show a surplus existed in the AVAA basin. Phelan sub silencio argues that, under *Peabody*, *supra*, 2 Cal.2d 351, the burden should instead have been on all parties to show the amounts actually pumped by each of the competing priority pumpers was devoted *solely* to reasonable and beneficial uses, and that the absence of such evidence left the issue of surplus unresolved.[30] Cross-defendants contend the trial court correctly ruled that Phelan, as the party asserting there was a surplus available for appropriation (necessary to its second cause of action) or there was "waste" (as asserted in Phelan's seventh cause of action), had the burden to show the amounts actually pumped exceeded the amounts devoted to reasonable and beneficial uses by the paramount rights holders.

We conclude the trial court correctly held Phelan had the burden of proof to show surplus and, to the extent Phelan contended that eliminating wasteful uses would reveal a surplus existed that would be available for appropriative uses by Phelan, to show the fact and extent of such alleged unreasonable or nonbeneficial use. Several cases support

---

[30]Phelan also claims the statement of decision from the Stage One trial, which rejected Phelan's "surplus" claim, was "flawed" because it "does not explain" why (under *Peabody*) the burden of proof was not placed on all parties to first establish their actual water use was also "reasonable and beneficial." Phelan did assert the statement of decision required such explanation, but the court's final statement of decision from Stage One addressing Phelan's claim for surplus *did* explain why it concluded Phelan had the burden of proof as to surplus. Moreover, we reject Phelan's claim that the issue of "reasonable and beneficial use" was never resolved below. While the Stage One statement of decision stated the court had not yet made (but would ultimately make) a determination whether other paramount rights holders devoted the water to reasonable and beneficial uses, it ultimately did resolve that question. The trial on the proposed Physical Solution contemplated that it would encompass evidence that the actual uses by the various pumpers were reasonable and beneficial uses, and evidence on this issue *was* introduced by proponents of the Physical Solution. Finally, the issue was addressed and resolved in the final statement of decision following Phase 6, when the court stated that "[b]ased on their credible and undisputed expert witness testimony, and substantial evidence in the fourth and sixth phases of trial, the Court finds that each stipulating Landowner Party and each Public Overlier has reasonably and beneficially used amounts of water which collectively exceeded the total native safe yield."

placing the burden of proof on Phelan, as the party asserting an appropriative right, to prove a surplus existed upon which it could predicate its claimed appropriative right. (*Allen v. California Water & Tel. Co.*, *supra*, 29 Cal.2d at p. 481 ["It is true that the burden of proving the existence of a surplus is on" the party asserting the appropriative right against overlying owners]; cf. *City of Lodi v. East Bay Mun. Utility Dist.*, *supra*, 7 Cal.2d at p. 339 [in dispute between later appropriator against prior appropriator, burden on former to prove surplus]; *Monolith Portland Cement Co. v. Mojave Public Utilities Dist.* (1957) 154 Cal.App.2d 487, 494 [dicta].) This allocation of the burden of proof is consonant with the general rule that a plaintiff has the burden of production and persuasion to support the allegations of its claims for relief. (See generally *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

Phelan's reliance on *Peabody* does not alter our conclusion the trial court correctly assigned to Phelan the burden of showing surplus and, as a predicate to establishing such a surplus existed, that there was waste. In *Peabody*, the trial court had entered a judgment in favor of the riparian owners and against the later appropriator on the theory that riparian owners were entitled to "all of the waters of the stream as the same were wont to flow in the course of nature, including the flood and freshet flows thereof, regardless of any waste or surplus that might result from the exercise of such a right and regardless of any rule of reasonable use." (*Peabody*, *supra*, 2 Cal.2d at p. 363.) The trial court in *Peabody* had not considered the impact of the then-recent amendment of the California Constitution, which added section 3 to article XIV, declaring "[t]he right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (*Peabody*, at p. 366.) The *Peabody* court reversed and remanded the judgment for reconsideration in light of those limitations, noting the issue is whether "after

41.

excluding all of the reasonable beneficial uses present and prospective (considering in connection therewith reasonable methods of use and reasonable methods of diversion) to which the waters of the stream are put, either under the riparian right or by prior appropriation, is there then water wasted or unused or not put to any beneficial use? If so, the supply or product of the stream may be said to be ample for all, a surplus or excess exists, … and the appropriator may take the surplus or excess without compensation." (*Id*. at pp. 368–369.) However, *Peabody* specifically considered whether the burden of proof should be on the riparian owner to show its riparian rights were injured by the appropriator's diversion, or should instead be on the appropriator to show "'that there is a surplus … upon the ground that such [appropriated] waters were waste or lost waters'" as had been held in *Miller v. Bay Cities Water Co.* (1910) 157 Cal. 256, 272. (*Peabody*, *supra*, at p. 381.) *Peabody* concluded "[t]he general rule in this state as to the burden of proof is laid down in [former] section 1981 of the Code of Civil Procedure as follows: 'The party holding the affirmative of the issue must produce the evidence to prove it; therefore, the burden of proof lies on the party who would be defeated if no evidence was given on either side.' However, when one enters a field of water supply and seeks by appropriation to take water from such supply on the claim that there is more than sufficient for all reasonable beneficial uses by those who have the prior and preferential right, it would seem to comport with the principles of fairness and justice that the appropriator, in whatever way the issue may arise, should have the burden of proving that such excess exists. We therefore reaffirm the rule to that effect in the *Miller* case." (*Ibid*.)

Thus, while *Peabody* and its progeny make clear that determining surplus can include consideration of whether the actual amounts used by paramount water rights holders are being applied to reasonable and beneficial uses, *Peabody* also casts upon the person claiming appropriative rights the burden of showing there is available surplus after accounting for reasonably and beneficially applied water by paramount rights holders.

When a showing of available surplus necessarily encompasses showing actual uses by paramount rights holders are unreasonable (as to either the type or manner of use), as well as quantifying such unreasonable uses in an amount necessary to provide for the surplus claimed by the appropriator, we conclude the burden of proof is upon the appropriator under *Peabody*.

We conclude Phelan was provided adequate opportunity to proffer evidence in support of its claim to water rights in the AVAA basin, that the trial court correctly placed on Phelan the burden of proving its claims, and that the phased proceedings did not impair Phelan's opportunity to present its case. We therefore reject Phelan's claim it was denied due process.

## IV. The Trial Court Correctly Concluded Phelan Had No Priority Claim to Return Flows from Native Safe Yield[*]

Phelan finally asserts that, to the extent native water was extracted from the AVAA basin by Well 14 and then used by Phelan's customers on land overlying the AVGB, Phelan was entitled to any return flows from such water, and therefore it was error to require Phelan to pay a replenishment assessment without accounting for such return flows. Phelan, relying on *Montana v. Wyoming* (2011) 563 U.S. 368 and various other foreign authorities discussing water law concepts of recapture of waste and seepage water, asserts the trial court erred in limiting claims for return flows to importers of nonnative waters. Cross-defendants argue the trial court below correctly held state law is dispositive and, under cases such as *City of Los Angeles v. City of San Fernando*, *supra*, 14 Cal.3d 199 (*San Fernando*), the interests recognized in return flows by California courts is limited to return flows from water *imported* by the claimant. Cross-defendants

---

[*]See footnote, *ante*, page 1.

argue that, because Well 14 only draws native water from the AVAA aquifer, the trial court correctly rejected Phelan's claim to return flows for water drawn from Well 14.[31]

California courts, when addressing the allocation of a limited supply of groundwater among competing claimants, have distinguished at least three sources of such water: (1) native groundwater (rainfall, infiltration from lakes and streams, and other natural inflows that percolate into the aquifer), (2) imported water and the return flows it generates (imported water that is used on the surface which then percolates into the aquifer), and (3) salvaged water (water that would have wasted to the sea during the rainy season but for the dams and reservoirs capturing and saving it from loss to the sea) and the return flows generated by its capture and use. (See generally *City of Santa Maria v. Adam*, *supra*, 211 Cal.App.4th at p. 280.) The courts have concluded that, when a party imports water into a basin that would otherwise not be available to that basin (i.e., not attributable to native sources of recharge), that party (after applying the water in the first instance) *also* has "the prior right to quantities of groundwater attributable to return flows of imported water." (*Id*. at p. 301.) This is a rule of priorities and "means that one who brings water into a watershed may retain a prior right to it even after it is used. [Citation.] The practical reason for the rule is that the importer should be credited with

---

[31]Although we will conclude the trial court correctly rejected Phelan's claims to return flows from *native* water, nothing in this opinion should be construed to foreclose Phelan from seeking relief under the terms of the judgment to the extent Phelan has become a de facto *importer* of water. Under paragraph 6.4.1.2 of the Physical Solution, Phelan must pay a "Replacement Water Assessment pursuant to Paragraph 9.2" for water it pumps from Well 14. This Replacement Water Assessment is apparently designed to cover the watermaster's costs for "replacement waters" and specifies it "shall be used [by the watermaster] to *acquire Imported Water*." (Physical Solution, ¶ 9.2, italics added.) Phelan was not party to the provisions of the Physical Solution (which delimited which persons or entities would be entitled to claim the benefits of "return flows") nor was it party to any other agreement which might exclude water purchased by the watermaster with replacement assessments from qualifying as "imported water." We express no views on whether Phelan has become, albeit involuntarily, a participant in a consortium of parties paying the watermaster to import water into the AVAA or whether such status entitles Phelan to claim return flow interests under the rationale of *San Fernando.*

the 'fruits … of his endeavors in bringing into the basin water that would not otherwise be there.'" (*Ibid.*)

This "fruits-of-his-endeavors" rationale has an important corollary: priority is *not* given to return flows from *native* waters. In *San Fernando*, our Supreme Court rejected such a claim, explaining:

> "Defendants contend that if any party is given rights to a return flow derived from delivered *imported* water, it is 'obvious' and 'axiomatic' that the same rights should be given to the return flow from delivered water derived from all other sources, including native water extracted from local wells. This argument misconceives the reason for the prior right to return flow from imports. *Even though all deliveries produce a return flow*, *only deliveries derived from imported water add to the ground supply*. The purpose of giving the right to recapture returns from delivered imported water priority over overlying rights and rights based on appropriations of the native ground supply is to credit the importer with the fruits of his expenditures and endeavors in bringing into the basin water that would not otherwise be there. *Returns from deliveries of extracted native water do not add to the ground supply but only lessen the diminution occasioned by the extractions.*" (*San Fernando*, *supra*, 14 Cal.3d at p. 261, 2d & 3d italics added.)

We agree with cross-defendants the trial court correctly ruled California does not grant an appropriator of native water any priority interest in return flows. In addition, the authorities relied on by Phelan do not convince us that *San Fernando* has been overruled sub silencio. For example, in *Montana v. Wyoming*, *supra*, 563 U.S. 368, the United States Supreme Court examined a narrow question: whether an interstate compact barred an upstream appropriator of native water supplies from using more efficient irrigation techniques because such efficiencies reduced the amounts returning to the watercourse for use by downstream appropriators. The *Montana* court merely concluded the interstate compact incorporated (and was not intended to alter) background appropriative water rights concepts, including the right of an appropriator to recapture and reuse his own waste and seepage before it escapes his possession and control, and that improving irrigation efficiencies was merely a form of recapture permitted under existing water law.

45.

(*Id*. at pp. 378–388.)  The *Montana* court did not purport to examine whether an appropriator is entitled to priority over return flows from native waters that have returned to the aquifer and is therefore inapposite.**32**

The California statutes cited by Phelan do not alter our conclusion.  For example, while Water Code section 71610 does permit a water district to "recycle, recapture, and salvage any water … for the beneficial use or uses of the district" (*id*. at subd. (a)), that section only describes powers of a water district and has never been applied to expand rights held by a water district.  Indeed, because that statute was in effect at the time the court issued its decision in *San Fernando* (see Stats. 1963, ch. 156, § 1, p. 823), but the court nevertheless held extractions of native waters are not accompanied by return flow rights in such water, we decline to apply that section to undermine the *San Fernando* holding.

## CONCLUSION

We conclude substantial evidence supports the judgment as to Phelan and Phelan was not deprived of its due process rights to present its claims.  We also conclude the court correctly rejected Phelan's claim its status as a municipal purposes appropriator

**32**The other cases cited by Phelan are equally unpersuasive.  For example, in *Department of Ecology v. United States Bureau of Reclamation* (1992) 118 Wash.2d 761, the issue resolved by the court was a narrow question:  whether a state agency could grant a permit to a landowner to appropriate water from a stream where such water was still subject to the appropriative rights held by the federal government.  The stream water in dispute was generated because a federal reclamation project drew water from the Columbia River and distributed that water to users within the project boundaries for irrigation and other purposes, but some portion of the water (after its initial use) then fed a stream that was still within the boundaries of that project. (*Id*. at pp. 763–765.)  The *Department of Ecology* court merely concluded the water in the stream was still subject to the federal government's appropriation rights (which specifically reserved the right to recapture and reuse waste and seepage waters generated by the reclamation project), and because it remained appropriated water owned by the federal appropriator within the project boundaries, it was not public water and could not be reappropriated by the landowner. (*Id*. at pp. 767–769.)  It appears that the water considered by the *Department of Ecology* court was more analogous to water "imported" into the reclamation project's boundaries by the reclamation project, and thus according superior rights to the federal importer is consonant with the rights accorded to importers of water under California law.

created an appropriative water right that was improperly constrained by the judgment, and did not err in rejecting Phelan's claim to return flows from native water pumped by Phelan from the AVAA basin.  Accordingly, we affirm the judgment as to Phelan.  Each party is responsible for its costs on appeal.

PEÑA, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

Filed 1/7/21

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTELOPE VALLEY GROUNDWATER CASES[*] | F082094<br>(JCCP No. 4408) |
| PHELAN PIÑON HILLS COMMUNITY SERVICES DISTRICT, | |
| Cross-complainant and Appellant, | |
| v. | **ORDER GRANTING PUBLICATION, DENYING REHEARING** |
| CALIFORNIA WATER SERVICE COMPANY et al., | |
| Cross-defendants and Respondents. | |

It appearing that additional parts of the opinion filed in the above matter on December 9, 2020, meet the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that parts I. and III. of the Discussion also be certified for publication in the Official Reports.

---

[*]*Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Los Angeles County, No. BC325201); *Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Kern County, No. S-1500-CV254348); *Wm. Bolthouse Farms*, *Inc. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC353840); *Diamond Farming Co. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC344436); *Diamond Farming Co. v. Palmdale Water Dist.* (Super. Ct. Riverside County, No. RIC344668); *Willis v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC364553); *Wood v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC391869).

Appellant's petition for rehearing filed December 22, 2020, in the above matter is hereby denied.

PEÑA, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.